UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
IDEAL STEEL SUPPLY CORPORATION

                                              Plaintiff,

-against-

JAN TRUCKING & RIGGING, INC. and
JAN PACKAGING, INC.

                                              Defendants.
----------------------------------------------------------X

04-CV-1196 (TCP) (ARL)

**MEMORANDUM,
OPINION** and **ORDER**

PLATT, District Judge.

Defendants Jan Trucking & Rigging, Inc. and Jan Packaging, Inc. (collectively "Jan" or "Defendants") bring a motion for summary pursuant to Rule 65 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") requesting dismissal of Plaintiff Ideal Steel Supply Corporation's ("Ideal Steel" or "Plaintiff") claims for negligence and breach of contract. Plaintiff brings these claims on the grounds that Defendants failed to properly reassemble a Steel Bar Retrieval System (the "System") after disassembling the unit and delivering it to Plaintiff's warehouse. Plaintiff has demonstrated a number of genuine issues of fact, and accordingly, Defendants' Motion for Summary Judgment is hereby **DENIED**.

**BACKGROUND**

A. *The Parties*

Ideal Steel is a New York Corporation which purchases large quantities of

steel from manufacturers and distributors, and then resells the steel in smaller quantities to an end user. Plaintiff stores their steel in two warehouses; one in St. James, Suffolk County and one in the Bronx. (Giacomo Aff. ¶ 2.) Jan is an interstate trucking and rigging company, licensed by the U.S. Department of Transportation and based in New Jersey. (Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 2.)

B. *The Agreement*

On or about May 2002, Ideal Steel purchased a fully operational Bar Retrieval System from a company located in New Jersey. The System is a complex device, which allows an operator to retrieve a bin containing steel bars by punching in a code on a computer screen. (Giacomo Aff. ¶ 3.)

In December 2002, Ideal Steel hired Jan to (i) disassemble the System in the seller's facility in New Jersey, (ii) transport the System from the seller's facility to a storage facility owned by Jan, (iii) transport the System from the storage facility to Ideal Steel's St. James warehouse; and (iv) reassemble and install the System in the St. James warehouse after final delivery was complete. (Brancato Aff. ¶ 4.) There is no dispute that these were the terms of the agreement.

C. *The Breach*

From February 24, 2003 to approximately April 10, 2003, Jan

disassembled the System and delivered it to Ideal Steel's warehouse. (Defs.' Mem. at 3.) Over the next few months, Jan attempted to reassemble and install the System in Plaintiff's warehouse, but could not get it to work. Plaintiff alleges that the System was damaged during Jan's reassembly and installation, and not during delivery. (Brancato Aff. ¶ 7.) Giacomo Brancato, the President of Ideal Steel, claims that Jan's foreman, Ted Margo, admitted that Jan was not equipped for this type of job and apologized to him. (Giacomo Aff. ¶ 8.) Soon thereafter, Mr. Brancato called the System's manufacturer, a German company named Katso, to examine it. In October 2003, a Katso representative confirmed that the System had been installed incorrectly. Ideal Steel alleges that it spent a substantial amount repairing the System, and that its business was damaged while the Company waited for it to become operational. (Giacomo Aff. ¶ 9.)

D. *The Bills of Lading*

During the period covering Defendants' delivery and installation of the System, Jan issued ten (10) Bills of Lading ("Bills"), which were all signed by a representative of Ideal Steel. (Baldwin Aff., Ex. A; Pl.'s Mem. Opp. Mot. Summ. J. ("Pl.'s Mem. Opp.") at 8-9.) On a number of Bills, under the heading "Description of Articles", an individual handwrote or typed the words "deliver, rig-in & assemble retrieval System." (Baldwin Aff., Ex. A.)

The back of the Bill includes the following provision:

### TIME FOR FILING CLAIM AND SUIT

> As a condition precedent to recovery, claims must be filed in writing with the carrier within nine (9) months after delivery of the property . . . . Suit shall be instituted against the carrier within two (2) years and one (1) day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, the carrier shall not be liable and such claims will not be paid.

(Baldwin Aff., Ex. A.) [hereinafter "the pre-suit filing requirement"]

Ideal Steel never filed a claim against Jan. Defendants argue that Ideal failed to meet a condition precedent to bringing suit by not filing such claim.

The Bill also includes this provision:

### NOTICE TO SHIPPER - LIMITATION OF CARRIER'S LIABILITY

> . . . Unless a greater value is declared by the shipper and stated on this Bill of Lading, the carrier's liability for loss or damage to any package or unpackaged item shall not exceed $5,000 per ton of 2,000 lbs. [1 ton] of actual weight, in accordance with the governing Tariff. Shipper Hereby Declares that the released value of this shipment is $ ___ . . .

Ideal Steel never declared a higher value for the shipment. Jan alleges the total weight of the shipment was 18 tons. Accordingly, Defendants allege the maximum allowable damages are $90,000 ($5,000 x 18). (Defs.' Mem. at 4.) Ideal Steel, however, alleges that the System weighs at least 73 tons, making the maximum $353,000. (Giacomo Aff. ¶ 6.)

4

E. *Attempted Resolution and Procedural Posture*

In the fall of 2003, Mr. Brancato contacted Jan's General Manager, Jim Baldwin, and advised him that the System was not working. Mr. Brancato said he would be forced to sue Jan if the claim could not be resolved through the insurance company. According to Mr. Brancato's affidavit, Mr. Baldwin replied that it was not necessary to do anything other than bring suit, and Ideal Steel should "just go ahead with filing a lawsuit." (Giacomo Aff. ¶¶ 10-11.)

On February 23, 2004, Ideal Steel filed this suit in New York State Court. About a month later, Jan removed the case to this Court on diversity and federal question grounds. (Giacomo Aff. ¶ 11.) Defendants argued this Court has federal question jurisdiction because the suit is governed by the Carmack Amendment to the Interstate Commerce Act. 49 U.S.C. §§ 10101-11917 (2006).

Defendants filed their motion for summary judgment on April 1, 2006 and Plaintiff filed its opposition on April 11, 2006. Oral argument took place on April 21, 2006.

## DISCUSSION

**A. Summary Judgment Standard**

Courts may grant summary judgment when the moving party demonstrates that there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). On motions for

5

summary judgment, courts must construe all facts and draw all inferences in favor of the non-moving party. *See Howley v. Town of Stratford,* 217 F.3d 141, 150-51 (2d Cir. 2000). Once the moving party comes forward with "specific facts showing that there is a genuine issue for trial," summary judgment should not be granted. *Matsushita Elec. Indus. Co.*, *Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

B.      **Whether The Carmack Amendment Applies to the Instant Matter**

Defendants argue that this case is governed by the Carmack Amendment (or "the Amendment") of the Interstate Commerce Act ("ICA"). This Amendment and the federal regulations which implement it, authorize a carrier such as Jan to *inter alia* (i) allow a shipper to file claims against it up to nine (9) months after final delivery, and (ii) bar suit if the claims are not filed in writing during that period. *See* 49 U.S.C. § 14706(e); 49 C.F.R. § 1005.2. Defendants' Bills of Lading incorporated both of these terms. Thus, if the Carmack Amendment applies, Ideal Steel's deadline for filing a written claim against Jan would have been nine (9) months after April 10, 2003, the final date of shipment. As Plaintiff failed to file claims against Jan within this period (or indeed, at any point)[1], Defendants contend that Ideal Steel did not meet a

---

[1] Defendants correctly argue that the Complaint in this lawsuit should not be considered a pre-suit written claim because it conflicts with the primary purpose of the Carmack Amendment, which is to limit litigation through the filing of claims. *See Pathway Bellows, Inc. v. Blanchette*, 630 F.2d 900, 904 (2d Cir. 1980) ("ICC's principal aim in promulgating these regulations was to encourage parties to settle claims instead of resorting to costly time-consuming litigation . . . .") (Defs.' Mem. at 7-9.) Moreover, even if the Complaint could be considered a written claim it would still be ineffective because it was filed in February 2004, more than nine months after the final shipment
6

condition precedent for bringing suit. (Defs.' Mem. at 5-7.) Furthermore, though not made clear in the parties' papers, application of the Carmack Amendment would preempt Plaintiff's state law claims and Plaintiff would be limited to the damages allowed by the Bill of Lading. *Commercial Union Ins. v. Forward Air, Inc.*, 50 F. Supp. 2d 255, 257 (S.D.N.Y. 1999) (citing *Cleveland v. Beltman North American Co., Inc.*, 30 F.3d 373, 380-81 (2d Cir. 1994) ("the Carmack Amendment has been held to preempt all state law on the issue of carrier liability.")

The Carmack Amendment implements a scheme of liability for goods lost or damaged during their transport in interstate commerce. *Adams Express Co. v. Croninger*, 226 U.S. 491 (1913). The threshold question then is whether Plaintiff's Bar Retreival System was being "transported" when it was damaged during reassembly (there is essentially no dispute that the damage occurred during reassembly and not delivery). The relevant definition of "transportation" is:

> services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property.

49 U.S.C. § 13102(23)(B)

Jan argues that the term "unpacking" in the definition would include reassembly of the System, and cites cases which offer a broad definition

---

occurred on April 10, 2003. (Defs.' Mem. at 9-10.)

of "transport." For instance, in *Walling v. Baltimore Steam Packet Co.*, 144 F.2d 130, 134 (4th Cir. 1944), the Fourth Circuit held that "services in connection with transportation" encompass any "service which the carrier is legally obligated to perform." Jan argues that because it was obligated to reassemble the System, reassembly must constitute "transportation".

In determining this question, we first consider the plain meaning of the statutory text. *See generally U.S. v. Pacheo*, 225 F.3d 148 (2d Cir. 2000) ("we must start by examining the plain meaning of the statute.") In common parlance, "unpacking" is in no way synonymous with "reassembly." Furthermore, the terms used in the definition generally describe the actual movement of goods from place to place (delivery, elevation, handling, etc.) Reassembly of the System, however, occurred completely within the Plaintiff's warehouse, after the goods were already moved. (Giacomo Aff. ¶ 4.)

The text's plain meaning is consistent with relevant case law. In *Cleveland*, the Second Circuit held that the Carmack Amendment addresses the "subject of carrier liability for goods lost or damaged during *shipment* and most importantly provides shippers with the statutory right to recover for the actual loss or injury to their property caused by any of the carriers involved in the *shipment*." 30 F.3d at 377 (citing 49 U.S.C. § 11701(a)(1)) (emphasis added). Thus, the Court indicated that the Carmack Amendment applied to actual movement of goods. In another case, *Pennsylvania Rail Co. v. M. McGirr Sons Co*, 287 F. 334 (2d Cir. 1922), the Second Circuit discussed the meaning of "transportation"

under the ICA. In that case, defendant hired plaintiff, a rail company and tugboat operator, to transport manure. The manure was first transported on defendant's "floats", which were towed by plaintiff's tugboats. Plaintiff then loaded the manure onto its rail cars and delivered it to the buyer. Defendant failed to pay plaintiff various charges for the tugboats and plaintiff sued under the ICA. The Second Circuit refused to apply the Act to the tugboat leg of the journey, holding:

> We think it definitely appears that the [Plaintiff's] relation as carriers did not commence until the cars were run off the floats onto their tracks at the New Jersey Terminal. While on the float, they were in the possession of the [Defendant] and in the custody of the captain of the [Defendant's] float. . . . [T]he towage contract is held by us not to be part of the interstate carriage contract[.]

*Id.* at 336-38.

Thus, even though the goods were literally being *shipped* by the plaintiff carrier when the fee dispute arose, the ICA did not apply because the goods were technically in the defendant shipper's possession. Here, as in *Pennsylvania Rail*, the System was in the possession of the shipper, Ideal Steel (in the company's warehouse) when it was damaged. Indeed, there is less reason to conclude the goods were being "transported" here than in *Commercial Union* because Jan was reassembling the System, not shipping it.

Following these Second Circuit precedents, this Court finds that the Carmack Amendment does not apply because the System was not being "transported" while Defendants reassembled it.

9

**C. Whether the Bills of Lading Cover Reassembly of the System even if the Carmack Amendment does not Apply.**

During oral argument, Defendants argued that the Bills of Lading applied to reassembly even if the Carmack Amendment did not, because the Bills were a contract which controlled all phases of the agreement. In support of their argument, Defendants pointed out that the ten (10) Bills were signed by representatives of Ideal Steel and four (4) include either handwritten or typed notes (the "notes") that mention reassembly.[2] (Baldwin Aff., Ex. A; Pl.'s Mem. at 8-9.) Thus, Defendants conclude, because Ideal Steel contracted for reassembly, the pre-suit filing requirement covers the entire agreement and bars the suit.

This Court agrees that the Bills of Lading constitute a binding contract. *See EF Operating Corporation v. American Buildings,* 993 F.2d 1046, 1050 (3d Cir. 1993) ("The bill of lading operates as both the receipt and the basic transportation contract between the shipper and the carrier, and its terms and conditions are binding.")

However, there are genuine issues of fact that prevent this Court from deciding on summary judgment whether the contract generally, and the pre-suit filing requirement specifically, covers the reassembly process. First, it is unclear when the notes were added to the Bills of Lading. As they are not part of the standard Bill, it is possible that representatives from Jan added the notes after the Bills were signed by Ideal Steel. In such case, the language describing

---

[2] The notes contain relevant language including, *inter alia* "Deliver, Rig-In, & Assemble Retrieval System", "install wiring", and "finish electrical connect." All such notes were written under the heading "Description of Articles." (Baldwin Aff., Ex. A.)

reassembly on the Bills would not be enforceable against Ideal Steel.

Second, the pre-suit filing requirement itself calls into question whether the Bills apply to reassembly. The key provision states that "claims must be filed in writing with the carrier within nine (9) months after delivery of the property." (Baldwin Aff., Ex. A.) Because claims arising from services performed after delivery (such as reassembly) could conceivably last longer than nine (9) months, logic suggests that the pre-suit filing requirement would not apply to such services. Similarly, this provision's focus on "delivery" suggests that the Bills may not apply to action taken after Jan completed such delivery. Thus, the parties' intent is unclear.

Lastly, Bills of Lading are issued pursuant to the Carmack Amendment under strict standards. *See Mexican Light & Power v. Texas Mexican RY. Co.* 331 U.S. 731, 735 (1947) (holding that a Bill of Lading did not apply to a transaction "when judged by the *rigid requirements* by which bills of lading are valid under the Carmack Amendment.") (emphasis added). Thus, it could be argued that the Bills may not apply to reassembly because the Carmack Amendment itself does not apply. *See supra* pp. 5-7. However, due to the sparse case law on the subject, this Court declines to find the Bills inapplicable to reassembly as a matter of law. Rather, the proper course is to construe the Bills as a contract which may or may not bind Plaintiff depending on their terms and the parties' intent. Because the Bills' terms and the parties' intent is unclear, summary judgment may not be granted. *See L.B. Foster Co. v. America Piles,*

*Inc.*, 138 F.3d 81, 88 (2d Cir. 1998) (citing *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993) ("In a contract dispute, summary judgment generally should not be granted unless the agreement is unambiguous.")

**D. Even if the Carmack Amendment or the Bills of Lading Control, there are Issues of Fact preventing this Court from Granting Summary Judgment.**

Plaintiff raises several meritorious arguments as to why this Court should not grant Summary Judgment even if it is bound by the Bills of Lading or the Carmack Amendment.

1. *Estoppel*

Ideal Steel argues that Jan is estopped from asserting its pre-suit filing requirement because Jan's General Manager, Jim Baldwin, told Ideal Steel's President, Giacomo Brancato, that he "should just go ahead with filing the suit." (Giacomo Aff. ¶ 13.) Plaintiff contends that this statement waived the filing requirement. While Mr. Baldwin denies making this statement, Defendants do not dispute that as General Manager he had the authority to make such a waiver. (Baldwin Reply Aff. ¶¶ 8-11.)

The Second Circuit discussed the circumstances under which a shipper may claim estoppel against a carrier's assertion of a pre-suit filing requirement, and found the following:

> Estoppel cannot be invoked absent evidence that the carrier told the shipper not to file or *otherwise led it to believe that filing was unnecessary to have its claim satisfied*.

*Imperial News Co. v. P-I-E Nationwide, Inc.*, 905 F.2d 641, 645 (2d Cir. 1990) (emphasis added).

Other courts have concurred, holding that a carrier is estopped from asserting a limitations defense if the carrier's conduct misled the shipper into believing that the timely filing of a written notice of claim was unnecessary.[3] *See e.g. Usinor Steel Corp. v. Norfolk Souther Corp.*, 308 F. Supp. 2d 510, 519 (D.N.J. 2004); *Perini-North River Assoc. v. Chesapeake & Ohio R.R. Co.*, 562 F.2d 269, 273-74 (3d Cir. 1977).

Here, taking the facts in the light most favorable to the Plaintiff, Ideal Steel has raised an issue of fact as to whether Jan misled Mr. Brancato into believing it was unnecessary to file a claim.[4] A jury must consider the credibility of Mr. Brancato and Mr. Baldwin and judge their demeanor in order to determine whether Mr. Baldwin made a statement, and if so, whether the statement was misleading. *See Colby v. Klune*, 178 F.2d 872, 873-74 (2d Cir. 1950) ("credibility ought not, when witnesses are available, be determined by mere paper affirmations

---

[3] Defendants cite a number of cases in opposition. The only controlling case is one from the U.S. Supreme Court, which held that a shipper could not waive certain terms of a Bill of Lading because the carrier converted the goods through misdelivery. *Georgia F. &. A. Ry. Co. v. Blish Milling Co.*, 241 U.S. 190, 196-97 (1916). However, the holding in *Georgia F. & A*. addressed whether waiver is possible because of conversion, not whether waiver is warranted when a carrier makes misleading statements. Accordingly, we find the case inapposite.

[4] Contrary to Defendant's claims, Mr. Brancato's affidavit is not entirely inconsistent with his deposition testimony, and thus not a "sham affidavit." (Defs.' Reply Mem. 3-4.)

or denials that inherently lack the important elements of witness' demeanor.")

Accordingly, Jan is estopped from asserting the filing requirement and Plaintiff is entitled to bring suit.

2. *Damages*

Plaintiff also argues that even if the Carmack Amendment applies, there remains a dispute over factual issues relating to damages. Defendants point out that under the Bills of Lading, Ideal Steel's damages are limited to $5,000 per ton. Defendants further state that they shipped 18 tons and thus the maximum amount of damages is $90,000.[5] (Defs.' Mem. at 11-13.) Mr. Brancato disputes this figure, claiming the System actually weighed about 73 tons and thus the maximum liability is $363,000. (Pl.'s Mem. Opp. at 11-12.) As Mr. Brancato was the one who purchased the System for his company's use; his affidavit holds considerable weight. Accordingly, there are facts in dispute as to the amount of damages.

**E. Prima Facie Showing of Liability under the Carmack Amendment**

Defendants argue that Plaintiff cannot establish a prima facie showing of liability under the Carmack Amendment because Ideal Steel has not

---

[5] Defendants claim that the Bills of Lading indicate that the weight shipped was 18 tons. This Court has been unable to locate this figure on any of the Bills. In any case, if a Bill included a weight, it would likely be unclear whether the weight referred to one delivery or all deliveries. (*See* Pl.'s Mem. Opp. at 11-12.)

offered an expert to testify as to the negligent reassembly of the System. Defendants offer no controlling law in support of this claim. The Third Circuit case Defendants cite, *Asplundh Mgf. Div. of Asplundh Tree Expert Co. v. Benton Harbor Engineering*, 57 F.3d 1190, 1201 (3d Cir. 1996), merely states that a lay opinion on technical matters must be reliable and helpful to the jury. Here, Ideal Steel apparently intends to offer testimony from the System's manufacturer, who found that the System was not reassembled properly. (Pl.'s Mem. Opp. at 10.) There is no reason to believe that the manufacturer's testimony would be unreliable or unhelpful. Accordingly, Defendants' argument fails.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is hereby **DENIED**.

**SO ORDERED**.

/S/_____
Thomas C. Platt, U.S.D.J.

Dated: April 26, 2006
Central Islip, New York